IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| GILL WEBB, | CASE NO. 1:23-cv-2038 |
| Plaintiff, | DISTRICT JUDGE CHARLES ESQUE FLEMING |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Gill Webb filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural background**

In May 2021, Webb filed an application for supplemental social security income (SSI), alleging a disability onset date in January 2016.[1] *E.g.*, Tr. 70. In

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

pertinent part, Webb alleged that he was disabled and limited in his ability to work due to carpal tunnel syndrome, dorsalgia,[2] mild sleep apnea, major depressive disorder, and post traumatic stress disorder. *Id.* The Commissioner denied Webb's application initially and upon reconsideration Tr. 79, 90.

In February 2022, Webb requested a hearing. Tr. 113. Administrative Law Judge ("ALJ") Genevieve Adamo held a telephonic hearing in August 2022. Tr. 38. Webb appeared, testified, and was represented by counsel at the August 2022 hearing. *Id.* Qualified vocational expert Brett Salkin also testified. Tr. 64. In October 2022, the ALJ issued a written decision, which found that Webb was not entitled to benefits. Tr. 14–37.

In October 2022, Webb appealed the ALJ's decision to the Appeals Counsel. Tr. 158. In August 2023, the Appeals Counsel denied Webb's appeal, Tr. 1, making the ALJ's October 2022 decision the final decision of the Commissioner. Tr. 14–37; *see* 20 C.F.R. §404.981.

Webb timely filed this action in October 2023. Doc. 1. In it, he asserts the following two assignments of error:

> 1.    The ALJ erred and her decision was not supported by substantial evidence when she failed to properly evaluate the opinion of the treating source in accordance with 20 CFR 416.920c.
>
> 2.    The ALJ committed harmful error when she failed to properly apply the criteria of Social Security

---

[2]    Dorsalgia is another term for back pain. *Chronic Low Back Pain*, University of Rochester Medicine, Neurosurgery: Translational Pain Research, https://www.urmc.rochester.edu/neurosurgery/pain-research/conditions/chronic-low-back-pain.aspx           [https://perma.cc/K3F7-D65A].

2

> Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained basis.

Doc. 7 at 1.

**Evidence**[3]

1.    *Personal and vocational evidence*

Webb was born in 1968 making him approximately 47 years of age at the date of onset. Tr. 70. Webb completed the 8th grade and did not obtain a GED. Tr. 25. He does not have, nor has he ever had, a driver's license. Tr. 25. He has past relevant work experience as a packing line worker, DOT[4] 753.687-038.

2.    *Medical evidence*

In March 2021, Webb participated in a telehealth office visit to review a sleep study and follow up on his sleep concerns. Tr. 244. He was noted to have obstructive sleep apnea, nightmare disorder, depression, and a history of substance abuse, though he was noted as sober for five years. Tr. 244–45.

---

[3]    The recitation of medical evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs.

[4]    DOT stands for the Dictionary of Occupational Titles. It is a standard classification of occupations established by the Social Security Administration. The DOT includes descriptions of the physical demands, environmental factors, and skill levels for various occupations.

James Ward, A.P.R.N., C.N.P.,[5] has provided mental health treatment and medication management to Webb since before the date of Webb's application through June 2022. *See e.g.*, Tr. 536–38, 1340–44. In May 2021, Kathleen Miller, M.S.W.,[6] also provided two counseling sessions with Webb. Tr. 271–73.

In September 2021, Nurse Ward noted that Webb had a low distress tolerance with chronic feelings of loneliness and fear of abandonment. Tr. 606.

In October 2021, Nurse Ward noted that Webb reported fighting in his sleep. Tr. 588. He further identified that, although Webb's depression had improved, he still had passive suicidal thoughts. Tr. 589–90. And, although Webb's mood was generally stable, Nurse Ward noted that Webb had worsening sleep and experienced nightmares. Tr. 590.

---

[5]     The acronym "A.P.R.N." stands for Advance Practice Registered Nurse, which is a title that includes the professional designation of "C.N.P." which stands for Certified Nurse Practitioner. A Nurse Practitioner has completed advanced training to diagnose and prescribe medication and must have completed a graduate degree program and become board certified. *See* CLEVELAND CLINIC, *Health Library: Articles: Nurse Practitioner*, https://my.clevelandclinic.org/health/articles/24651-nurse-practitioner [**https://perma.cc/FZ8J-RETS**].

[6]     The acronym "M.S.W." stands for Master of Social Work, a graduate degree program. See FORBES ADVISOR, *M.S.W. Vs. LCSW: What's The Difference?*     https://www.forbes.com/advisor/education/social-work/msw-vs-lcsw/ [**https://perma.cc/Z7YE-2DJ2**].

Beginning in January 2022 and continuing through July 2022,[7] Mark Krzysiak, L.S.W., also provided weekly mental health treatment for Webb. *See e.g.*, Tr. 889–902, 1119–1121.

In March 2022, Mr. Krzysiak wrote that Webb reported that he saw the devil on a daily basis and that the devil told him to start drinking again. Tr. 1195. Mr. Krzysiak noted further that Webb said he was able to make the devil go away by shouting at it, so they worked on developing alternative ways to make it go away without vocalizing in public. *Id*.

In April 2022, Mr. Krzysiak noted that Webb had isolated himself at home and that the police had to be called for a wellness check when he refused to respond to contact from family. Tr. 1062.

Also in April 2022, Ashley Miller, Psy.D., performed a neuropsychological evaluation report based on a referral from Nurse Ward. Tr. 848–49. Dr. Miller's "Impressions and recommendations" were that:

> On formal effort testing Mr. Webb performed below expectation. Specifically, his performance was below the established cut-offs across three separate measures of performance validity, including below chance performance on one measure. Due to concerns regarding suboptimal test engagement, his data is not able to be interpreted as they may underrepresent his cognitive potential.
>
> Overall, Mr. Webb has a longstanding history of impairment in intellect, per his academic history, and adaptive functioning, which was first apparent during early childhood, suggestive of intellectual

---

[7]    It is possible that treatment continued after this time, however, the documentation period for this application ended in July 2022.

disability. However, in the absence of valid cognitive test results it is difficult to characterize the severity of his intellectual disability, and other cognitive impairment, at this time. He is able to live independently, can navigate public transportation, and manages his basic daily activities and simple tasks without difficulty, but relies on support from his family for other more complex tasks. He has reportedly never obtained gainful employment. Nonetheless, other factors including severe mood symptoms may be serving to exacerbate longstanding areas of weakness as well as interfere with his overall functioning at this time. In line with this, continued regular mental health treatment is strongly advised, and I agree with the patient's family's decision to monitor medications, as well as other daily activities with the potential for harmful repercussions at this time. He is already appointed a case manager, but there may be other resources and supports available to the patient though his local Board of Development Disabilities. They should also be able to offer intellectual testing for diagnostic purposes if it is needed in the future. Continued abstinence from alcohol and other illicit substances is strongly supported. Owing to continued purging behaviors, Mr. Webb may benefit from meeting with a nutritionist at this time, in addition to addressing these issues with his mental health providers.

Tr. 848–49.

In June 2022, Nurse Ward detailed a treatment plan for Webb that included a plan to coordinate his mental health care, manage his anxiety and depressive symptoms, manage his psychosis, and manage his trauma symptoms. Tr. 929. Later in June 2022, Nurse Ward noted that Webb experienced financial strain and awoke "with dreams that [he would] be turned down for disability." Tr. 906. He also included a note in quotations: "Sometimes

6

I just feel like ending this shit." *Id.* Nurse Ward noted in the same appointment that Webb was "future oriented, will be going out for a cookout. Recently went with family to Cedar Point and had a good time." *Id.* He noted that Webb stated, "I need to be around people" and that Webb "reflected on his 13 yr old grandson and the time they spend together as meaningful -sees himself as a father figure." *Id.* Nurse Ward also noted that Webb is sponsoring his brother who is in recovery and that Webb remains engaged with his own sponsor. *Id.*

    *3.*     *Opinion evidence*

In October 2021, Nurse Ward completed a check-box mental impairment questionnaire. Tr. 584–85. Nurse Ward stated that he has treated Webb since March 2017 for monthly medication management and follow-up visits. Tr. 584. He indicated that Webb had a "poor" prognosis and "continued to struggle in terms of function in workplace despite ongoing engagement in treatment." *Id.* For all but one of the described conditions or limitations in this check-box opinion, Nurse Ward marked that Ward would be "unable to meet competitive standards." Tr. 584–85. As to Ward's ability to "understand and remember very short and simple instructions," Nurse Ward indicated that Ward was "seriously limited but not precluded." Tr. 585. Nurse Ward did not provide any narrative explanation of what symptoms supported each of the boxes checked. *See id.* Nurse Ward opined that Webb would be absent from "at least 50% of work shifts" and that he would be off task when performing tasks "50-75%" of the time. *Id.*

4.      *Webb's Function Report*

In June 2021, Lakesha Mitchell, QMHS-M,[8] assisted Webb in completing a function report. Tr. 187–94. In his Function Report, Webb described that he was limited in his ability to work because "when I try working … the voices get to me a[nd] I start responding to them I stay scared and anxious. Then I cannot read or write well so I could never understand the direction." Tr. 187. Webb described that during the day he would: 1) wash up; 2) fix breakfast; 3) walk around the community; 4) have dinner; and 5) go to bed. Tr. 188. He further stated that he "had the same issues all my life" and that his condition affected his sleep because "the voices tell me not to sleep." *Id.* Webb also marked that he had no problem with personal care and that he did not require any special reminders to take care of his personal needs. *Id.* But he stated that he had alarms set or received reminders from his daughter to take his medicine. Tr. 189. He described "trouble remembering an[d] focusing, reading" and that he can pay attention for "less than a minute." Tr. 191. Webb stated that he interacted with family members and watched television every day, and he regularly went to the grocery store and to his

---

[8]      The designation of QMHS-M stands for Qualified Mental Health Specialist, a credentialed role that involves at least a bachelor's degree level of education and training in the mental health field. *See* BRIDGEWATER COLLEGE, Department of Psychology, *How to become a Qualified Mental Health Professional (and what to look for in a program)*, https://www.bridgewater.edu/academics/divisions/psychology/how-to-become-a-qualified-mental-health-professional-and-what-to-look-for-in-a-program/ **[https://perma.cc/X4YJ-98BP].**

daughter's house. Tr. 192. He also stated that he needs a routine to function and did not handle stress well. Tr. 193.

### 5.    *State Agency consultants*

In July 2021, state agency psychological consultant Courtney Zeune, Psy.D., evaluated Plaintiff's mental functional abilities based on a review of the record in July 2021. Tr. 73–77. Dr. Zeune opined that Webb was "capable of understanding, remembering and carrying out simple routine tasks," "capable of maintaining attention, concentration, persistence and pace for simple routine tasks," "capable of brief superficial interaction with others," and "capable of adapting to a routine work setting where changes are infrequent." Tr. 76–77. Dr. Zeune also noted that Webb had "mild cognitive limitations" but that no records of special education were received to confirm Webb's reports that he had a history of special education or that he has a history of paranoia and hearing voices. Tr. 76. Also in July 2021, state agency consultant Dr. Lynne Torello reviewed Webb's physical conditions and opined that Webb had a residual functional capacity[9] (RFC) at the medium exertional level, with the following limitations: lift or carry 50 pounds; frequently lift or carry 25 pounds; stand, walk, and sit, with normal breaks, for about six hours of an eight-hour

---

[9]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

workday; frequently climb ladders, ropes, and scaffolds; frequently stoop and crawl; and no limitations as to climbing ramps or stairs, balancing, kneeling, or crouching. Tr. 75.

On reconsideration in December 2021, state agency consultant Vicki Warren, Ph.D., found that the prior mental RFC findings continued to be supported by the record. Tr. 87. Also on reconsideration, state agency consultant Rannie Amiri, M.D., found that the initial physical RFC determination remained supported. Tr. 86.

     6.    *Hearing testimony*

Webb testified that he was born December 16, 1968, had completed the 8th grade, and had never had a driver's license. Tr. 45. He explained that he was asked not to return to his last job because he was not performing it correctly and people said he was speaking to himself. Tr. 46–47. Webb stated that he was not looking for work because he could not read, write, or comprehend the things that someone would ask him to do as part of an application. Tr. 47. Webb also stated that he had a "severe nervous condition," explaining that when he was asked questions he would shake and "get nervous." Tr. 47.

Webb testified that he had a "psych doctor at the clinic" and took medication that "helps me." Tr. 48. But, he explained, he needed help "with everything," so his daughter organized and made sure he took his medicine. Tr. 48. Webb testified that he does not have problems with taking a bath or

getting dressed, but his daughter sometimes called to remind him to bathe or help him pick out an outfit. Tr. 49. Webb stated that he watched television but also liked to sit in the dark Tr. 50.

Web stated that he saw two counselors that he had been meeting with for five years. He said he found them helpful, in particular Nurse Ward, who he said "called him 'daily on basics'" and to talk with him. Tr. 52. Webb testified that he was sober for five years. Tr. 51.

Webb stated that would have problems performing a job because of his attention span and the anxiety that occurred when someone put something in front of him and he was not able to do it. Tr. 52.

Webb also testified that he would have difficulty getting up and going to work every day because his medication, Trazadone, made it difficult to wake up in the morning. Tr. 53. Webb also explained that this medication made him drowsy and recalled one instance when he laid in bed for two weeks and his daughter called the police for a wellness check. Tr. 54. He explained that he and his daughter would yell at each other, typically because he had not bathed, washed dishes, or taken out the garbage, despite her telling him to do so. Tr. 56–57.

6. *Vocational Expert*

Vocational Expert, Brett Salkin, provided testimony during the August 2022 telephone hearing. Tr. 64–67. The ALJ described a hypothetical person who could perform work at the medium level of exertion with additional non-

exertional limitations, including allowance for a "flexible and goal-oriented pace." Tr. 64–65. Salkin testified that the hypothetical person could not perform Webb's past work, because "packing lines have an external pace," but the hypothetical person could perform jobs as a cleaner, dishwasher, or groundskeeper Tr. 65–66. Salkin opined that to maintain employment, a person cannot be off task more than 10% of the time or absent more than once a month. Tr. 66. He also opined that maintaining employment would not be an issue if the hypothetical person were illiterate because the jobs available to the hypothetical person did not require reading or writing. Tr. at 67. Salkin explained that if the hypothetical person required "frequent redirection," then "no jobs could be identified for this individual." Tr. 67.

**ALJ Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since May 18, 2021, the application date (20 CFR 416.971 *et seq.*).
>
> 2. The claimant has the following severe impairments: degenerative changes of the lumbar spine, intellectual disorder, major depressive disorder, and posttraumatic stress disorder (PTSD) (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the

residual functional capacity to perform medium work as defined in 20 CFR 416.967(c), except frequently climbing ladders, ropes, or scaffolds, stooping, and crawling; can understand, remember, and carry out simple instructions and routine, repetitive tasks; can perform jobs that can be demonstrated by physical or oral demonstration; cannot perform work requiring a specific production rate, such as assembly-line work; can meet production requirements that allow a flexible and goal-oriented pace; can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods; can deal with occasional changes in a routine work setting; could tolerate occasional interaction with supervisors, coworkers, and the general public, and contact still includes what is necessary for general instruction, task completion, or training; cannot perform tandem tasks.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on December 16, 1968 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since May 18,

2021, the date the application was filed (20 CFR 416.920(g)).

Tr. 19–34.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

14

> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving h[is] lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of Review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations

15

omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Analysis**

Webb presents two issues on appeal to this Court. Doc. 7, at 1. Both arguments are refuted by the Commissioner, Doc. 9, at 4-13, and neither provide a sufficient basis for remand.

*1.    Webb's first argument* is that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly analyze a treating source opinion in accordance with 20 C.F.R. § 416.920c. *See* Doc. 7, at 8-16.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency;

16

treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. § 416.920c(a), (c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Before turning to Webb's first argument, it bears noting that the opinion from Nurse Ward on which Webb bases his argument, *see* Doc. 7, at 9–11 (citing Tr. 584–585), is a check-box form of the sort that are often discounted in Social

17

Security cases, *see*, *e.g.*, *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 630 (6th Cir. 2016). Such opinions are often discounted because ALJs are "not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *See Cohen v. Sec'y of Dep't Health & Hum. Servs.*, 964 F.2d 524, 528 (6th Cir. 1992). So Webb's argument is not off to a strong start.

Webb's first argument is that the ALJ "incorrectly" evaluated the evidence when she found that Webb's treating source opinion was unsupported and inconsistent. Doc. 7, at 11. To this end, Webb appears to argue that the ALJ made an incomplete review of the record such that her statements as to Webb's abilities were not supported by substantial evidence in the record. *Id.* And, as a result, Webb asserts that the ALJ's conclusion that Nurse Ward's opinion was unpersuasive "was contrary to the evidence." *Id.*

Here, the ALJ not only recognized that Nurse Ward's opinion "contains very little narrative discussion," Tr. 31, the ALJ also provided a detailed analysis of why she found Nurse Ward's opinion to be otherwise unsupported, inconsistent, and ultimately unpersuasive. *See* Tr. 31–32. It thus appears that Webb simply disagrees with the ALJ's weighing of the evidence, which, as his own brief details, *did* include consideration of the consistency and supportability of Nurse Ward's opinion as required under Section 416.920(c). *See* Doc. 7, at 10.

While it is possible that a different weighing of the evidence could have resulted in a different conclusion, the task of considering the evidence rests with the ALJ. 20 C.F.R. § 404.1520c(a) (explaining how *the ALJ* will consider and weigh medical opinions and prior administrative medical findings); *see also Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020)) ("this court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job."). And the fact that Webb can point to evidence that may support a different conclusion does not mean the ALJ's determination was unsupported by substantial evidence or amounted to reversable error. *Jones*, 336 F.3d at 477 ("we must defer to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'").

Webb's argument is seemingly premised in part on his belief that the former treating physician rule[10] should apply, such that Nurse Ward's opinion should have been given controlling weight. *See* Doc. 7, at 15. To this end, he cites *Battaglia v. Comm'r of Soc. Sec.*, No. 22-cv-1459, 2023 WL 3900356 (N.D.

---

[10]    Under 20 C.F.R. § 416.927(c)(2), known as the "treating physician rule"—which applies to applications filed *before* March 27, 2017—the ALJ must give a treating source opinion controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." 20 C.F.R. § 416.927(c)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). And ALJs must provide "good reasons" for the weight they give to treating physicians' opinions. 20 C.F.R. § 416.927(c)(2).

Ohio June 8, 2023), for the proposition that Nurse Ward's "treating opinion was entitled to controlling weight if well supported and not inconsistent with other substantial evidence." Doc. 7, at 15. *Battaglia*, however, does not operate to reinstate the treating physician rule. Rather, it arose out of an application for benefits submitted at a time when the treating physician rule still applied. *See Battaglia*, 2023 WL 3900356, at *15 (prefacing that the Court's analysis was conducted "[u]nder the regulations applicable when Mrs. Battaglia first file her claim"). Webb does not assert that his application was filed at a time when the treating physician rule still applied, and the record shows it was filed after the rule was eliminated. *See* Tr. 70 (showing an initial filing date of May 18, 2021). So Webb has failed to accurately cite *Battaglia* and has taken its statement out of context.

Webb makes a series of additional arguments in his brief on the merits, none of which justify remand or demonstrate that the ALJ erred. Specifically, Webb asserts that the ALJ's statements about supportability and consistency were "incorrect and contrary to the evidence in this matter." Doc. 7, at 10–11. He also says that the ALJ "incorrectly stat[ed] that the records indicated that Plaintiff was normally alert and oriented, cooperative, engaged, accessible, calm, had a pleasant behavior, was appropriately groomed, with no overt psychosis, suicidal ideation, or homicidal ideation." *Id.* at 11 (citing Tr. 31–32). Webb is mistaken. The ALJ was not "incorrect" in these observations of Nurse Ward's notes because the ALJ's observations are almost verbatim contained in

the records that the ALJ cited. For instance, Nurse Ward's progress notes stated that Webb "denies suicidal thoughts, denies homicidal thoughts," that he was calm and pleasant, and that he was cooperative, engaged, and accessible. *See e.g.*, Tr. 907.

Next, Webb asserts that the ALJ contradicted herself because her description of certain of Webb's behaviors, earlier in the decision, are contrary to a finding that Nurse Ward's opinion was unsupported. Doc. 7, at 11–12. But this argument essentially amounts to Webb selecting certain statements that he views as favorable and arguing that they should have been afforded more weight by the ALJ. The fact that the ALJ described some evidence that could support Nurse Ward's opinion does not mean it was an error for the ALJ to conclude that, after reviewing the entire record of evidence, Nurse Ward's opinion was unpersuasive. *Rottmann*, 817 F. App'x at 196.

Webb also recites multiple pages of medical evidence without connecting the cited evidence to any clear argument. Doc. 7, at 12–14. But reciting evidence, without more, doesn't show that the ALJ's decision is unsupported by substantial evidence. *See Bass*, 499 F.3d at 509 (explaining that a court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility").

And Webb argues that the ALJ failed to connect the evidence to her conclusion. Doc. 7, at 16. But the ALJ did connect the evidence to her ultimate conclusion that Nurse Ward's opinion was unpersuasive because she

specifically described and cited medical evidence that showed his opinion was unsupported and inconsistent. Tr. 31–32 (citing to multiple medical records and Webb's own hearing testimony to support her conclusion).

In his reply brief, Webb argues that "[b]oth the ALJ and Defendant erroneously misconstrued the relevant regulation regarding the evaluation of medical opinions." Doc. 10, at 4. But Webb does not provide any citation to a particular regulation. Additionally, in his reply, Webb expresses his belief that the evidence he cited "supported the opinion of Nurse Ward." Doc. 10, at 3. As discussed above, the fact that Webb can point to evidence to support his view, does not mean that the ALJ erred. Even if there were evidence to support both perspectives, the fact that the ALJ chose a perspective with which Webb disagrees does not mean that the ALJ's decision was not supported by substantial evidence. *Jones*, 336 F.3d at 477.

Because the ALJ's decision is supported by substantial evidence, I recommend that this argument be rejected.

2.    *Webb's second argument* is that the ALJ committed harmful error by failing apply the criteria of Social Security Ruling 16-3p and failing to find that the intensity, persistence and limiting effects of Plaintiff's subjective symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained basis. See Doc. 7 at 16.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's

statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

Webb's second argument is belied by the record. For starters, Webb's argument chiefly consists of a lengthy recitation of evidence and the conclusion that the ALJ erred. *See* Doc. 7, at 17–20. But he offers no analysis to support his conclusion. This approach fails to provide a sufficient argument for the Court to consider. *See Bass*, 499 F.3d at 509 (explaining that a court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility").

Moreover, the ALJ properly analyzed Webb's subjective symptom complaints under applicable regulations and her conclusion that Webb's

symptom complaints were unpersuasive was supported by substantial evidence. The ALJ stated that she carefully considered the evidence and found certain medically determinable impairments could cause Webb's described symptoms, but that his subjective statements regarding the "intensity, persistence and limiting effects of [his] symptoms [was] not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 25. This statement describes the ALJ's obligation to consider Webb's symptoms under SSR 16-3p. *See also* Tr. 24 (stating that the ALJ made her findings "based on the requirements of 20 CFR 416.929 and SSR 16-3p"). Webb has presented nothing that would lead the Court to discount the ALJ's statement that she complied with the applicable regulations. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021) ("We … presume the agency has considered all the evidence and properly discharged its duties."); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").

Indeed, it appears that Webb is actually arguing, not that the ALJ failed to evaluate the relevant factors, but that the ALJ failed to "articulate any supportable rationale for her findings that [Webb's] statements, ... were not entirely consistent with the medical evidence." Doc. 7 at 20. This argument is distinguishable from an argument that the ALJ failed to apply governing

regulations and appears to, instead, take issue with how the ALJ weighed the evidence with which she was presented. *See* Doc. 7, at 20 (stating that the ALJ's decision was not supported by the record and that the ALJ "ignored and/or disregarded" certain evidence that did not support her conclusion).

In support of Webb's second argument, he calls out evidence that be believes supports the conclusion that Webb's symptom complaints were consistent with the medical evidence. Doc. 7, at 19–20. But, by making this argument Webb commits the very error that he alleges the ALJ committed: he ignores the contrary evidence of record. Webb's second argument focuses on the evidence that he views as supporting his subjective complaints and, through citation to evidence he views as favorable, urges this Court to conclude that the ALJ ignored subjectively favorable evidence. But the ALJ stated that she considered the entire record. *See e.g.*, Tr. 24. Webb does not provide any support for his contention that the ALJ ignored evidence in the record. Absent evidence to the contrary, the Court will presume that the ALJ's statement is true. *See Newark Elec. Corp.*, 14 F.4th at 163.

Webb also cites certain evidence, including a function report, that the ALJ did not describe with much detail when she evaluated Webb's symptom complaints, to support his second argument. Doc. 7, at 18 (citing to certain symptoms described in Webb's function report (Tr. 187)). But the fact that the ALJ did not specifically re-cite portions of the record does not mean that the ALJ did not evaluate the entire record or that her opinion is not supported by

substantial evidence. *See Thacker*, 99 F. App'x at 665. Indeed, the ALJ *did* cite Webb's function report when she recognized that Webb "has alleged greater functional limitations" but that "the record is absent [of] sufficient objective evidence to support his allegations." Tr. 28 (citing Webb's hearing testimony and function report).

Further, as explained above, the fact that Webb can point to evidence that may support one conclusion, does not mean that the ALJ's opposite conclusion was unsupported by substantial evidence. *Jones*, 336 F.3d at 477. Rather, the ALJ's decision offered a detailed analysis of the supportability and consistency of Webb's complaints against the backdrop of the entire record of evidence. *See* Tr. 25–30 (concluding that based on objective medical evidence, Webb's testimony, and his description of his symptoms "the record does support some limitations due to his symptoms and allegations[,]" but his allegations are "not entirely consistent with the evidence"). Because ALJ cogently described what evidence was or was not consistent with Webb's complaints and made a decision that was supported by substantial evidence, I recommend Webb's second argument be rejected.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: July 16, 2024

_/s/ James E. Grimes Jr._

James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. _See Berkshire v. Beauvais_, 928 F.3d 520, 530–531 (6th Cir. 2019).